Filed 1/19/22  G.F. Korea v. Yehyang CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| G.F. KOREA, INC. et al., | |
| Plaintiffs and Respondents, | G054427 |
| v. | (Super. Ct. No. 30-2014-00755207) |
| YEHYANG, INC. et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed.

JK Law Firm and Jean Kwon; Hampton Firm and Kyle A. Hampton for Defendants and Appellants.

The Law Offices of Collin Seals, Collin Seals and John Seals; Charles L. Murray III for Plaintiffs and Respondents.

The parties in this appeal claim this case presents an "uncommon situation where a plaintiff obtained a jury verdict based on a theory" the jury was not instructed on. Specifically, they assert that while there was evidence to support a promissory fraud judgment, the jury was only instructed on other kinds of fraud, and therefore the fraud verdict must be reversed. While that would be a rare and interesting case, it is not what actually transpired here. Ji Young Kim (and her company G.F. Korea) presented evidence to support her theory of the case — she fell prey to a fraudulent scheme involving intentional misrepresentations and concealment of material facts. Thus, she submitted jury instructions that were supported by the evidence. We find no reason to disturb the jury's fraud verdict or the punitive damages award. We affirm the judgment.

FACTS

I. *The Parties*

Jong Dae Lee (Lee) and his wife Ji Young Kim (Kim), were devout Christians from South Korean. They had four school-aged children. Lee and Kim both had bachelor degrees in chemistry, and Lee ran a small company in Korea providing electrical work. Before 2011, they did not speak or read English.

Ik Soo Bang (Ik), a pastor, and his wife, Hye Young Bang (Hye), were also South Korean nationals.[1] Ik, formally a musician, became an ordained pastor in 2000. In 2004, the Bangs immigrated to America. In 2009, Ik started his own church and Hye purchased Corea BBQ. The Bangs had three adult children.

II. *How They Met*

The Bangs met Lee and Kim in April 2011, during a religious revival meeting in Korea. After Ik finished preaching, he attended a dinner with members of Lee and Kim's congregation. A few months later, the two couples attended another revival meeting where Ik delivered sermons. The two couples dined together, and they discussed

---

[1] To avoid confusion, we refer to Ik and Hye Bang by their first names when the context requires but will otherwise refer to them collectively as the Bangs.

2

faith and Ik's church's need for money. At the time, Lee was not aware Ik would often visit churches in Korea to seek donations. He later learned these donations were Ik's "main income."

After he returned to the U.S., Ik solicitated loans and donations directly from Lee and Kim to support his church and mission-related projects. Ik told Lee and Kim about a gospel record he was making. Lee and Kim loaned Ik 20 million South Korean won (approximately $20,000 at the time) to help fund the project. Lee and Kim made a second donation (6 million won) to help two students in Ik's congregation. Kim stated Ik would frequently call her from the U.S. to ask her for money.

Ik also encouraged Lee and Kim to visit Irvine, California, where Ik's congregation was based. He highlighted the opportunities available to families living in the United States. In December 2011, Lee and Kim accepted Ik's invitation to visit him in Irvine. Lee and Kim discovered the Bangs maintained several houses in close proximity, and the occupants (over 30 people in the church's congregation) agreed to community living and shared meals together. In addition to the Bangs's residence, one house was occupied by a group of young men (mostly university students) and another house contained young women. Lee and Kim stayed in a house close to the "community" for two months and paid the Bangs for room and board.

Lee and Kim met Hannah Kim (Hannah) and her husband William Jang at the house (called "big house") used by church members for group activities. Jang was an assistant pastor. Ik asked Lee and Kim to "support" Jang for one year. When Lee hesitated, Ik stated that if Lee was going to leave his children in the Bangs's care, then Lee should do something in exchange. Lee loaned the church 2 million won per month (approximately $1,800 per month) to support Jang's ministry at the church. Lee believed this was not a donation because Ik stated he would pay back the money.

During their visit, Ik promoted the benefits of having Lee and Kim's children (ages 7, 9, 11, and 13) educated in Irvine. The Bangs showed Lee and Kim the

Irvine schools and constantly praised the quality of education.  The Bangs discussed the possibility of Lee and Kim immigrating via an E-2 visa, which were granted to individuals having business investments in the United States.  This visa would allow Lee and Kim's children to attend Irvine schools.  The Bangs did not mention the possibility of Kim purchasing Corea BBQ to satisfy the E-2 visa requirements until after Lee returned to Korea.

III.  *Living in America*

At the end of December 2011, Lee and Kim decided to apply for an E-2 visa.  The Bangs told them that they only needed to make a $300,000 investment to qualify for the visa.  Kim stated she made the decision to move the children to America because she trusted Ik's opinion it would be a better place to live and she believed everything he said.  They made arrangements for Kim to stay in America with the children, living separately from Lee, who returned to Korea.

In January 2012, and after Lee left the U.S., the Bangs told Kim about an investment opportunity they believed would satisfy the E-2 visa requirements.  The Bangs suggested Kim purchase Corea BBQ.  Kim and Lee initially did not know Hye owned the restaurant.  She designated ownership of Corea BBQ in the name of her company Yehyang, Inc.  The Bangs represented Corea BBQ was worth $500,000, but they could arrange a sale for $300,000.  The Bangs also stated the restaurant would generate enough income to support Kim's family.  The Bangs reassured Lee and Kim that they could ask for a refund after Kim's youngest child graduated from college.

IV.  *The Deal*

Lee and Kim did not get involved in the negotiations to purchase Corea BBQ, trusting the Bangs to make all the arrangements.  The Bangs told Kim she could not be involved in the operation of the business nor be concerned about the profits.  Specifically, the Bangs promised that they, with the help of one of Yehyang's officers, Hannah, would run the business and collect all the money to support Kim's family.  Ik

4

repeatedly told Lee and Kim that if they "hinder[ed] any process" Ik would no longer support them and they should leave America.

In January 2012, Lee and Kim consulted with an immigration attorney, Han Joo Kim (Han), about obtaining an E-2 visa. Han advised Kim to form a corporation and then apply for the visa. Han helped Kim incorporate G.F. Korea, Inc. and Hannah became one of the corporation's officers.

The sale between Yehyang and G.F. Korea took place in March 2012. In addition to the sale price, the transaction required a $57,000 check made payable to Hye. Hannah wrote the check from G.F. Korea's bank account. Thereafter, the Bangs told Kim that if she tried to get involved in managing Corea BBQ or questioned anything about it, she and the children would have to go back to Korea.

Afterwards, to facilitate the visa application, Han asked an accountant to prepare a five-year business forecast for Corea BBQ. Han submitted this and evidence of the corporation, the purchase agreement, the transfer of funds, a business plan, and other necessary documents to the U.S. Embassy.

V. *The Aftermath*

After the sale, Hye and Hannah retained control of Corea BBQ. The bank statements for G.F. Korea were mailed to the Bangs's home address.

In August 2012, Kim obtained the E-2 visa and returned to America. For the next two years, Kim did not take part in managing Corea BBQ. She did not review financial records. She did not know any of the employees. She explained this was because the Bangs told her that she had no responsibilities regarding Corea BBQ, because they were managing it. For these two years, Kim lived with her children in Irvine, and Lee lived in Korea.

All did not proceed as planned. In April 2014, Kim discovered problems with the payment of Corea BBQ's taxes. This led to issues renewing the E-2 visa. Relying on the Bangs's promise to refund their money, Kim asked Ik for her money back.

5

Ik pretended not to know what Kim was talking about and the following day removed items from her residence. The relationship deteriorated further when the Bangs stated Kim and Lee needed to manage Corea BBQ. In February 2015, Kim received a 60-day notice to terminate the commercial lease for Corea BBQ. Thereafter, Kim had no choice but to close the restaurant. Ik expelled Kim and her family from the community.

Lee and Kim later discovered Corea BBQ, at the time of purchase, was worth approximately $45,000. Moreover, they discovered the lease was month-to-month, lowering the restaurant's value and placing their investment in danger.

VI. *The Lawsuits*

In November 2014, G.F. Korea filed a lawsuit, which was later amended to add Kim as a plaintiff (plaintiffs). The operative complaint, which was the first amended complaint (FAC) alleged causes of action for (1) breach of contract; (2) breach of fiduciary duty; (3) fraud; and (4) money had and received. Relevant to this appeal, the fraud claim asserted the Bangs and Yehyang made false representations to plaintiffs, and they knew the statements were false. Plaintiffs sought punitive damages. In January 2015, Hannah and Hye filed a cross-complaint against plaintiffs, alleging wage and hour claims, as well as breach of contract.

Trial was held in August 2016. The jury determined plaintiffs prevailed on their affirmative defenses to the cross-complaint. The jury found for plaintiffs on each claim in the FAC as follows:

(1) It awarded G.F. Korea nominal damages of $1 against Yehyang for breach of contract, $66,300 against Hye for money had and received, and $30,000 against Hannah for breach of fiduciary duty. These awards are not challenged on appeal.

(2) The jury awarded G.F. Korea $286,526.33 against the Bangs, Hannah, and Yehyang for fraud.

(3) It awarded Kim nominal damages of $1 against the Bangs and Yehyang for fraud.

6

(4) The jury awarded punitive damages, ordering Hannah and Yehyang to each pay $150,000.

(5) It ordered Ik and Hye to each pay $500,000 in punitive damages.

The court denied the losing parties' posttrial motions for judgment notwithstanding the verdict, as well a motion for a new trial.

DISCUSSION

The Bangs's appeal is based on two related arguments. First, they maintain the court failed to instruct on promissory fraud, in addition to the intentional misrepresentation and concealment instructions provided. Second, they maintain the fraud verdict must be reversed because most of the evidence concerned promissory fraud, which is not the same as ordinary fraud. They also assert the fraud verdict could not be based on a layperson's opinion about the value of Corea BBQ. We address these contentions in turn below, concluding each lacks merit.

I. *Instruction on Promissory Fraud*

In raising the argument of instructional error, the Bangs are in the uncomfortable position of conceding the evidence supported a promissory fraud verdict. They argue, however, the plaintiffs waived the theory of promissory fraud by not alleging this claim in their complaint and by not requesting a specific instruction on this theory of recovery. Moreover, the Bangs assert the instructions relating to fraud and promissory fraud are not interchangeable, because they require different elements of proof, and the instructional error warrants a new trial.

To support their argument that the plaintiffs' case was entirely about false promises rather than intentional misrepresentations, the Bangs refer to a portion of plaintiff's counsel's closing argument. In summarizing the alleged grounds for the fraud claim, counsel stated the following: "How did this all start? . . . I'm not going to go through the whole thing. I don't have time. But we have the representations that were made to my client from the Bangs. Have your kids educated here. The business is worth

7

$500,000. It will be enough to pay for your kids' tuition. It will be a long term deal. You'll be able to support your children, right." The Bangs assert these statements are all purported promises about future events, i.e., grounds for only a promissory fraud claim, not any other type of fraud. This claim lacks merits for several reasons.

A. *Intentional vs. Negligent Misrepresentations*

We found no case authority to support the Bangs's theory an intentional misrepresentation claim must be based on statements about past or existing facts, rather than future events. As stated long ago by our Supreme Court. "'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.] [¶] 'Promissory fraud' *is a subspecies of the action for fraud* and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*) italics added.)

In making their argument statements about future events cannot support an intentional fraud claim, the Bangs rely on cases involving *negligent* misrepresentation actions. (Citing *Stockton Mortgage, Inc. v. Tope* (2014) 233 Cal.App.4th 437, 458 (*Stockton*) [summary judgment on negligent misrepresentation claim because alleged representation was not about past or existing facts]; *Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158-159 (*Tarmann*) [misrepresentation insurer would pay for repairs not actionable as negligent misrepresentation because it was promise of future performance].)

These cases do not help the Bangs. Instead, they highlight an important distinction between negligent and intentional misrepresentation claims. "Although a false promise to perform in the future can support an *intentional* misrepresentation claim,

8

it does not support a claim for *negligent* misrepresentation. [Citation.]" (*Stockton, supra,* 233 Cal.App.4th at p. 458.) The *Tarmann* court added the following: "Certain broken promises of future conduct may . . . be actionable. Civil Code section 1710, subdivision (4) defines one type of deceit as 'A promise, made without any intention of performing it.' As Witkin explains, 'A false promise is actionable on the theory that a promise implies an intention to perform, that *intention to perform or not to perform* is a state of mind, and that misrepresentation of such a state of mind is a misrepresentation of *fact*. The allegation of a *promise* (which implies a representation of intention to perform) is the equivalent of the ordinary allegation of a representation of fact.' [Citation.]" (*Tarmann, supra,* 2 Cal.App.4th at p. 158.)

In addition to misapplying case law, we conclude the Bangs's contention lacks merit because the plaintiffs' case was not based on unkept honest promises or the failure to perform a future act. As described in more detail below, the plaintiffs presented evidence the Bangs knowingly concealed material facts, and their misrepresentations were intentionally fraudulent.

B. *Proper Jury Instructions Regarding Plaintiffs' Claim*

The Bangs assert their motion for new trial should have been granted because the trial court gave erroneous or misleading instructions. (Citing Code Civ. Proc., § 657; *Bristow v. Ferguson* (1981) 121 Cal.App.3d 823, 826 [improper civil conspiracy instruction].) But in this case, the fraud and concealment instructions were neither misleading nor erroneous. The court instructed the jury with CACI Nos. 1900 [intentional misrepresentation] and 1901 [concealment]. The Bangs do not suggest these instructions were defective nor were they modified to be misleading.

They appear to be suggesting the court should have, sua sponte, instructed on promissory fraud because the claim was supported by the evidence. "Whereas in criminal cases a court has strong sua sponte duties to instruct the jury on a wide variety of subjects, a court in a civil case has no parallel responsibilities. A civil litigant must

9

propose complete instructions in accordance with his or her theory of the litigation and a trial court is not "obligated to seek out theories [a party] might have advanced, or to articulate for him that which he has left unspoken." [Citations.]' [Citation.]" (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653.)

Alternatively, the Bangs maintain the plaintiffs failed "to propose proper jury instructions on all legal theories advanced in the case." They explain that because plaintiffs did not request the promissory fraud instruction, the jury must have improperly decided the case on "extraneous evidence or legal theories" not presented by the parties. This argument requires us to take a huge leap of faith. The Bangs have not explained why we must assume the only evidence presented at trial related to promissory fraud. They provide only one record reference to a small portion of plaintiffs' counsel's closing argument. This is not evidence. Moreover, counsel clarified he was "not going to go through the whole thing" before listing five misrepresentations. Thus, the Bangs's record citation was a list of some, but not all, of the alleged misconduct.

As noted by plaintiffs, there were multiple grounds for fraud, beyond the allegations mentioned in closing argument. For example, there was evidence to support a verdict of fraud by concealment. The Bangs represented Corea BBQ as both a secure and safe long term investment, concealing the restaurant's lease was actually month-to-month and could be cancelled on short notice. It was plaintiffs' theory this omission was part of the Bangs's larger scheme to obscure the current and true value of Corea BBQ. Plaintiffs presented evidence showing how the Bangs manipulated events to stop Kim from discovering the true nature of the purchase agreement and the actual value of the investment. This is the gravamen of the fraud action, not future promises that plaintiffs' children could complete their education in America.

Indeed, we were unpersuaded by the Bangs's simplistic analysis of plaintiffs' counsel's comments during closing argument as relating only to unfulfilled but honest promises or promissory fraud. The first element of promissory fraud requires "a

10

promise made regarding a material fact without any intention of performing it[.]" (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1498.) An example of promissory fraud is when a bank promises to modify the terms of a homeowners loan, without ever intending to do so. (*Ibid.*) Another common example is when an employer fraudulently induces a prospective employee to enter into a contract with false promises. (*Lazar, supra,* 12 Cal.4th at p. 639 [enticing worker to relocate to new state, employer falsely promised permanent and secure employment, significant salary increase, and work with financially strong company].)

When viewed in context, plaintiffs' counsel's closing argument was not discussing examples of promises. When counsel commented on the Bangs's assertion children are better educated in America, he was not suggesting the Bangs fraudulently promised to educate Kim's children at a future date. Rather, the statement was in reference to a larger fraudulent scheme employed to manipulate Kim and her family into parting with large sums of money. The plaintiffs presented evidence that the Bangs spent months grooming them. This was accomplished by gaining their trust through religion, borrowing money for the church, and enticing them to become entirely dependent on the church community with stories of a better life in America. Only after taking these steps were the Bangs able to hoodwink Lee and Kim into purchasing a purportedly failsafe business investment needed for an E-2 visa and the chance to remain in the U.S.

In light of this backdrop, we conclude the Bangs's representations about the value and profitability of the business investment were not promises about anything in the future. The Bangs intentionally misrepresented and concealed material facts existing at the time of the sale. For example, the Bangs's representation they would negotiate the sale of a business worth $500,000 for just $300,000 was a clever ploy. Kim fell for it hook, line, and sinker, drawn to an easy E-2 visa qualifying investment at an irresistible bargain price. Hye owned the business and offered to sell it straightaway; she was not promising to help Kim look for a discounted investment in the future. More importantly,

11

the Bangs did not promise the restaurant would be worth $500,000, but rather asserted this was its current value.[2] Similarly, statements about the restaurant's profitability, and that it would be enough to cover the family's present and future living expenses, related to the current investment value and the parties' existing circumstances.

Hye, as the current owner, was well aware of the tenuous status of the lease before she offered it for sale. Her representation the restaurant was the type of long term investment Kim needed was a statement inferring the restaurant's longevity was adequately secured. If the Bangs had promised to obtain a longer lease after Kim purchased the restaurant, without any intention of doing so, this evidence may have been a claim for promissory fraud. But there was no evidence of such a promise in this case.

On a final note, we find disingenuous the Bangs's repeated assertions that Kim and Lee should have asked more questions before buying the restaurant. We cannot ignore the mountain of evidence establishing the Bangs expertly manipulated two devoted congregation members, deceiving them both before and after the sale. The jury had ample reason to reject the Bangs's theory the sale involved arms-length negotiations between parties on equal footing.

In summary, the plaintiffs presented evidence of fraudulent conduct, which mirrored the allegations in their complaint, i.e., fraud by intentional misrepresentations and concealment. In closing argument, plaintiffs' counsel summarized some, but not all, of the supporting facts and requested instructions on the theory of the case. We conclude plaintiffs proposed, and the trial court gave, appropriate instructions on legal theories advanced in the case. We find no error.

---

[2] Later in their briefing, the Bangs appear to concede the business valuation of $500,000 was an intentional representation, not another false promise supporting a promissory fraud claim. However, they maintain the jury could not rely on a nonexpert business valuation in rendering a fraud verdict. This alternative argument will be discussed later in this opinion.

## II. *Sufficiency of the Evidence*

As part of the Bangs's arguments about instructional error, they suggest there was only evidence of promissory fraud, and therefore, insufficient evidence to support the jury's fraud verdict. As mentioned above, the jury's fraud verdict was based on instructions describing liability for intentional misrepresentations and concealment of material facts. In this opinion, we have already discussed some of the evidence supporting the jury's fraud verdict. The Bangs cite only to the complaint and part of the closing argument, apparently hoping we would not review any more of the record. Thus, to the extent the Bangs have attempted to raise a sufficiency of the evidence challenge to the verdict, we deem the issue waived. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246 (*Pope*).)

"We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party. Thus, we *only* look at the evidence offered in [the winning party's] favor and determine if it was sufficient." (*Pope, supra,* 229 Cal.App.4th at p. 1245.) "[W]hen a losing party challenges the verdict for a lack of substantial evidence, they 'must set forth, discuss, and analyze *all* the evidence on that point, *both favorable and unfavorable*. [Citation.]' (Italics added.) [Citation.] Appellants' 'fundamental obligation to this court, and a prerequisite to our consideration of their challenge' [citation], is to 'set forth the version of events *most favorable to* [*respondent*]' [citation]. 'Accordingly, if, as defendants here contend, "some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived." [Citation.]" (*Pope, supra,* 229 Cal.App.4th at p. 1246.)

## III. *Business Valuation*

The Bangs argue we must reverse the fraud judgment because it cannot be based on a layperson's business valuation opinion. In making this argument, they are of

course conceding this testimony was something other than promissory fraud (contradicting their earlier contention the valuation was somehow a promise). They maintain their statement Corea BBQ was worth $500,000 was "simply an opinion of value," which cannot be an actionable misrepresentation. They cite a case where the homeowner sued his lending bank, not the appraiser, for representations about the home's value and that it would appreciate. (*Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594.) That court observed, "[r]epresentations of opinion, particularly involving matters of value, are ordinarily not actionable representations of fact. [Citations.]" (*Id.* at p. 606.)

In arguing the judgment could not be based on a layperson's opinion, the Bangs are essentially asserting the court erred in allowing Lee and Kim to testify they heard the Bangs say Corea BBQ was worth $500,000. This contention naturally raises the question of whether anyone objected to the admissibility of this testimony. In a footnote, the Bangs acknowledge they raised the issue in a motion in limine. However, they do not explain why the court denied the motion. Plaintiffs tell us the court also considered and rejected this same issue raised in the Bangs's summary judgment motion. The Bangs do not say whether they raised any new objections at trial.

Another crucial element missing from the Bangs's argument are any supporting record citations. Did the Bangs merely offer their honest opinion, or was there evidence they always knew the property was not worth $500,000? What if the Bangs randomly picked a wildly inflated value to fraudulently make their sale price look like a bargain in comparison? In their appellate briefing, the Bangs make no effort to provide any evidentiary context for Kim and Lee's testimony regarding valuation of the business. We have no reason to accept the Bangs's self-serving assertion the evidence shows there was nothing more than a good faith opinion of value.

Due to the lack of supporting record references to the challenged evidence, and absence of legal discussion addressing whether the court abused its discretion, we

14

deem the argument waived.[3]  We review a trial court's exercise of discretion in admitting evidence for abuse, and the ruling "'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'  [Citation.]"  (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447.)  Moreover, "Claims of evidentiary error under California law are reviewed for prejudice applying the 'miscarriage of justice' or 'reasonably probable' harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, that is embodied in article VI, section 13 of the California Constitution.  Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred.  [Citation.]"  (*Ibid.*)  The business value misrepresentations were but one of many examples of the Bangs's fraudulent conduct in this case, and the Bangs do not suggest how the purported error caused the level of prejudice required for a reversal.

III.  *Remaining Arguments*

The Bangs's remaining arguments depend on the success of the contentions we have already rejected.  First, they assert Hannah cannot be liable under a conspiracy or aiding and abetting theory if this court reverses the jury verdict regarding the Bangs's fraud.  Second, they argue the award of punitive damages is dependent on the underlying fraud verdict.  Having affirmed the fraud judgment, these two arguments become meritless.

---

[3]      We need not address the Bangs's related argument there are no special circumstances, such as a confidential relationship, that would convert an opinion into an actionable misrepresentation.  The Bangs explain they discuss this issue only in anticipation that it may be raised by the plaintiffs.  It was not.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.